1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11 ALEXANDER MICHAEL MALES,        )
                                   )
12              Plaintiff,         )
                                   )    No.  CV-07-416-HU
13      v.                         )
                                   )
14 MICHAEL J. ASTRUE,              )
   Commissioner of Social          )
15 Security,                       )    FINDINGS & RECOMMENDATION
                                   )
16              Defendant.         )
                                   )
17

18 John Mayfield
   1275 S.W. Second
19 Beaverton, Oregon 97005

20      Attorney for Plaintiff

21 Karin J. Immergut
   UNITED STATES ATTORNEY
22 District of Oregon
   Britannia I. Hobbs
23 ASSISTANT UNITED STATES ATTORNEY
   1000 S.W. Third Avenue, Suite 600
24 Portland, Oregon 97204-2902

25 / / /

26 / / /

27 / / /

28 / / /

1 - FINDINGS & RECOMMENDATION

David Morado
REGIONAL CHIEF COUNSEL
David M. Blume
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Social Security Administration
Office of the General Counsel
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

Attorneys for Defendant

HUBEL, Magistrate Judge:

Plaintiff Alexander Males brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. § 405(g). I recommend that the Commissioner's final decision be reversed and remanded for further proceedings.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI in March 2004, alleging an onset date of March 1, 2002. Tr. 63-66, 262-64. His applications were denied initially and on reconsideration. Tr. 23-24, 30-34, 37-39, 265-74.

On September 11, 2006, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 275-316. On October 24, 2006, the ALJ found plaintiff not disabled. Tr. 11-21. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-7.

FACTUAL BACKGROUND

Plaintiff alleges disability based on seizures, left shoulder problems, and medication side effects. Tr. 147-48. He also contends that he suffers from depression.

At the time of the September 11, 2006 hearing, plaintiff was

2 - FINDINGS & RECOMMENDATION

thirty-one years old.  Tr. 279.  He has a high school education.
Tr. 279.  His past relevant work is as a punch press operator, a
janitor, and working for a window manufacturer. Tr. 285-88.

I.  Medical Evidence

        The earliest medical record in the Administrative Record is
dated October 13, 1998.  Tr. 197-98.  At the time, plaintiff was
twenty-three years old.  The report is of a follow-up visit with
Dr. James R. Schimshock, M.D., of the "Child Neurology Clinic."
Id.  Dr. Schimshock noted that plaintiff had been seizure-free for
sixteen months while taking 750 milligrams of Depakote, three times
daily, and 100 milligrams of Lamictal, two times daily.  Id.  Dr.
Schimshock  further  noted  that  plaintiff  worked  at  an  x-ray
recycling facility and was living with an aunt who was supervising
his medications.  Id.  He had no new health problems.  Id.  Dr.
Schimshock made no changes to his medications and indicated he
would see plaintiff again in nine months.  Id.

        In April 1999, plaintiff begin treating at Kaiser.  Tr. 215.
He saw Dr. Vicki L. Reid on April 27, 1999, to establish a primary
care physician, and to request a referral to neurology.  Id.  In
her report, Dr. Reid noted plaintiff's history of seizure disorder,
with unknown etiology, since age fourteen.  Id.  Plaintiff reported
that his last seizure was about one and one-half years ago, and
that he had been tolerating the Depakote and Lamictal well.  Id.
He reported a slight tremor to his hands over the previous few
months, but no other side effects.  Id.  He had no other health
complaints at the time.  Id.

        On physical exam, Dr. Reid noted that plaintiff had a mild
tremor in his hands, which she described as more of an "intention"

3 - FINDINGS & RECOMMENDATION

tremor[1] rather than a "resting" tremor.  Id.

Plaintiff saw Kaiser neurologist Dr. Stephen Gancher, M.D., on April 10, 1999.  Tr. 213-14.  Plaintiff reported to Dr. Gancher that since age fifteen, he has had "generalized seizures," and that he also had "partial seizures" consisting of "left head turning and obtundation[.][2]"  Tr. 213.  He reported not having had any seizures in "awhile."  Id.  Plaintiff told Dr. Gancher that he was doing "reasonably well."  Id.  He worked full-time, swing shift, for a company that made x-ray trays, plastic walking casts, and other goods.  Id. He did not describe any specific problems functioning, other than reporting that if he moves one hand, the other hand will move involuntarily.  Id.

On physical exam, Dr. Gancher noted that plaintiff had, intermittently, a fine lateral head tremor.  Id.  He also noted that plaintiff had "mirror movements," which were "brought out when plaintiff would alternatively tap his index and long finger against the thumb and twitching of the contralateral index and long fingers were visible."  Id.

Plaintiff next saw Dr. Gancher on March 2, 2001.  Tr. 209-10. At the time, he was still taking 750 milligrams of Depakote, three times daily, and 100 milligrams of Lamictal, twice daily.  Tr. 210.

---

[1]  A "[t]remor when voluntary motion is attempted."  Taber's Cyclopedic Medical Dictionary 1482 (Clayton L. Thomas ed., 14th ed. 1981)

[2]  "Obtund" means "[t]o make less intense; dull or deaden." American Heritage Dictionary of the English Language 1250 (3d ed 1992).  One online source defines "obtundation" as "a dulled or reduced level of alertness or consciousness." http://www.medfamily.org/dictionary/O/terms-obtundation.phtml

4 - FINDINGS & RECOMMENDATION

1   Dr. Gancher noted that plaintiff was there primarily "to have a
2   form filled out[,]" and that he had been out of work for a year.
3   Id.

4       Plaintiff's aunt, who accompanied him to the appointment,
5   stated that he was having problems with slow mentation and with
6   hand and head tremors.   Id.   She further reported that he was
7   having problems getting work.   Id.   She remarked that plaintiff
8   works at a slower speed and learned more slowly than other adults.
9   Id.  She thought it was attributable to his medications, as he was
10  quicker mentally before starting on anti-convulsants.   Id.

11      On physical examination, Dr. Gancher noted that plaintiff had
12  a very slight head tremor, causing at most a centimeter of
13  movement.   Id.   There was a barely discernible hand tremor,
14  although plaintiff's aunt noted that the tremor was much worse.
15  Id.   He had no nystagmus and was able to balance and walk in
16  tandem.   Id.

17      Dr. Gancher stated that plaintiff's seizures were under good
18  control.   Id.   He indicated that it was possible that plaintiff
19  might be experiencing some cognitive side effects from his
20  medications, especially the Depakote.  Dr. Gancher suggested that
21  plaintiff lower the dose of Depakote and increase the dose of
22  Lamictal, but plaintiff was disinclined to do this as his seizures
23  have been fully controlled.   Id.  Dr. Gancher filled out a form for
24  GoodWill, stating that plaintiff had some signs of tremor and some
25  slowed mentation and difficulty concentrating.   Id.

26      On March 7, 2001, plaintiff saw his primary care physician Dr.
27  Reid.  Tr. 209.  She noted plaintiff's concern about changes to his
28  medications as suggested by Dr. Gancher.   Id.  She indicated he was

5 - FINDINGS & RECOMMENDATION

1  still thinking about it, but unwilling to make any changes at that
2  time.  Id.  Dr. Reid also noted plaintiff's "having some
3  relationship and job stresses," which prompted plaintiff to inquire
4  about a counselor.  Id.

5      On physical examination, Dr. Reid noted a slight tremor in his
6  hands, bilaterally, and remarked that he had a somewhat blunted
7  affect.  Id.  She maintained him on his current medications, after
8  plaintiff declined to make any changes to them.  Id.  She also
9  noted that because the plaintiff was on the Oregon Health Plan, he
10  should contact the mental health provider as indicated on his card.
11  Id.  Her assessment included an adjustment disorder.  Id.

12      The next medical record in the Administrative Record is from
13  Dr. Richard Koller, M.D., in Bend, Oregon, on February 25, 2003.
14  Tr. 217-20.  Dr. Koller notes that plaintiff was referred to him by
15  Dr. David Evans for evaluation of a seizure disorder.  Tr. 217.
16  There do not appear to be any records from Dr. Evans in the
17  Administrative Record.

18      Plaintiff reported to Dr. Koller that he had been taking
19  Depakote and Lamictal, with no seizures for five years.  Tr. 217.
20  Plaintiff believed his last seizure was in 1996 or 1997.  Id.
21  Plaintiff reported that he experienced an occasional tremor and
22  hair loss with the Depakote, but overall, he tolerated it very
23  well.  Id.  He also reported being a bit slow in his thinking and
24  speech, but felt he was doing reasonably well for the most part.
25  Id.  He reported no other major complaints neurologically.  Id.

26      Dr. Koller recorded plaintiff's past medical history as
27  including "shoulder/wrist/hand" surgery, and epilepsy.  Id.  He
28  noted that plaintiff was looking for work and was on unemployment.

6 - FINDINGS & RECOMMENDATION

1  Id.   In  his  review  of  systems,  Dr.  Koller  noted,  under  the
2  neurologic  category,  that  plaintiff  complained  of  tremor  and
3  shaking,  but  denied  memory  loss  and  trouble  concentrating.   Tr.
4  218.   In  the  psychiatric  system  category,  he  noted  that  plaintiff
5  denied  depression,  other  emotional  problems,  and  anxiety.   Id.  Dr.
6  Koller  noted  that  plaintiff  was  slow  to  respond  during  the  mental
7  status  exam.   Tr.  219.

8      On  May  10,  2004,  plaintiff  saw  Dr.  Suzanne  El-Attar,  M.D.,  for
9  an  SSI  consultative  exam.   Tr.  221.   Dr.  El-Attar  noted  that
10 obtaining  a  complete  history  was  a  bit  difficult  because  plaintiff
11 seemed  to  have  difficulty  with  dates  "and  some  memory  issues."   Id.

12     Plaintiff  identified  two  issues  significant  to  his  work
13 status.   Id.   First,  he  noted  a  history  of  left  shoulder
14 dislocation,  followed  by  surgery  in  1995  or  1996.   Id.  Subsequent
15 to  the  surgery,  he  no  longer  experienced  dislocations,  but  he
16 suffered  from  chronic  pain  and  aching  and  decreased  range  of
17 motion.   Id.  He  reported  that  Tylenol  helped  the  pain.   Id.

18     Second,  he  identified  his  seizure  disorder.   Id.  He  reported
19 that  the  seizures  were  controlled  with  his  medications,  but  that
20 the  medications  affect  him  with  chronic  tremors,  difficulty  with
21 thought  processes,  and  slurred  speech.   Id.  Dr.  El-Attar  observed
22 a  resting  tremor[3]  in  both  hands,  but  no  intention  tremor.   Id.

23     On  physical  examination,  she  found  slightly  decreased  range  of
24 motion  in  his  left  shoulder.   Tr.  222,  225.   She  concluded  that

25

26     [3]  "[A]  [t]remor  present  when  the  involved  part  is  at  rest
27 by  absent  or  diminished  when  active  movements  are  attempted."
28 Taber's  1492.   See  Footnote  #1  for  definition  of  "intention
   tremor."

7 - FINDINGS & RECOMMENDATION

1  plaintiff was limited by both his shoulder and his medications for
2  seizures.   Tr. 222.   She limited him to twenty-five pounds of
3  lifting with the left arm.   Id.

4       While she indicated that he was affected by his seizure
5  medications, and noted that his memory was not completely normal,
6  she concluded that this would not likely impede him from certain
7  types of jobs.   Id.   She thought the bigger limitation was the
8  shoulder.   Tr. 222-23.

9       On July 27, 2004, Dr. Martin Kehrli, M.D., completed a
10 physical residual functional capacity assessment of plaintiff.   Tr.
11 235-43.   He concluded that plaintiff had no visual or communicative
12 limitations.   Tr. 238-39.   He also concluded that plaintiff should
13 avoid concentrated exposure to hazards such as machinery and
14 heights.   Tr. 239.

15      Dr. Kehril found that plaintiff had the following exertional
16 limitations:  frequently or occasionally lifting or carrying up to
17 twenty-five pounds with the left upper extremity[4], standing or
18 walking for six hours in an eight-hour day, and sitting for six
19 hours in an eight-hour day.   Tr. 236.   For postural limitations,
20 Dr. Kehril limited plaintiff to occasional climbing of ramp and
21 stairs, and never climbing of ladders, ropes, and scaffolds.   Tr.
22 237.   He also concluded that plaintiff had the ability for only
23 occasional overhead reaching in all directions with the left upper

24

25      [4]  Dr. Kehrli's limitation to both "frequently" and
26 "occasionally" is unclear.   Occasionally refers to less than one-
   third of the time and frequently refers to less than two-thirds
27 of the time.   Tr. 236.   If the limit is to lift up to twenty-five
   pounds frequently, this subsumes a limit of lifting up to twenty-
28 five pounds occasionally.

8 - FINDINGS & RECOMMENDATION

extremity.  Tr. 238.

On December 8, 2004, plaintiff was examined by Dr. Deborah Syna, M.D., of Northwest Neurological Specialists.  Tr. 259-61. Dr. Syna notes that plaintiff was referred by Dr. Terrance Olson, M.D., and she refers to having reviewed plaintiff's medical records from Dr. Olson's office.  Tr. 259.  However, none of these records appears in the Administrative Record.

Plaintiff reported to Dr. Syna that he had not had a seizure in six or seven years.  Id.  He noted that he had episodes of "spacing out," which involved his head turning to the left and experiencing "brief episodes of time that seem to have gotten away from him."  Id.  Dr. Syna noted that plaintiff stated he had not had one of those types of episodes in a couple of years.  Id. Plaintiff told Dr. Syna that his seizures were managed quite well by his current medication regime, which continued to be Depakote and Lamictal, but he complained of side effects including weight gain, grogginess, slurred speech, and tremor.  Id.  He also complained of mild depression and frustration at not being able to get, or hold a job.  Id.

On mental status examination, Dr. Syna noted that plaintiff's affect was somewhat slow and that his speech was "ponderous."  Tr. 260.  On physical examination, she noted that he had a mild, intrinsic tremor of the head and hands.  Id.

Her impression was that plaintiff had generalized epilepsy with intermittent blackouts, depression, and "[l]earning disabilities/unemployability."  Id.

On February 4, 2005, plaintiff underwent a neuropsychological evaluation, at Dr. Syna's request, by Laurence M. Binder, Ph.D.

9 - FINDINGS & RECOMMENDATION

1   Tr. 243-47.   On his mental status examination, Dr. Binder noted

2   that plaintiff's affect was flat, his speech was a little slow, and

3   he was slow on simple tests of attention and thinking speed.   Tr.

4   244.

5        Dr. Binder administered more than a dozen tests to plaintiff

6   to assess his neuropsychological functioning.   Tr. 245.   He

7   discusses the results of these tests in some detail.   Tr. 245-47.

8   Overall, he concluded that the results of testing "are not clearly

9   invalid, but they are not clearly valid either."   Tr. 247.   He

10  noted that the results of validity testing were not consistent and

11  there was the possibility that plaintiff was not always optimally

12  motivated.   Id.

13       Dr. Binder noted that plaintiff showed "clear superiority of

14  verbal intellectual over visual thinking."   Id.   His verbal memory

15  scores generally were normal except for verbal recognition memory

16  on one test.   Id.   In contrast, he performed in atypical fashion on

17  one of the visual memory tests, with his raw score declining from

18  the first to the second trial.   Id.   Testing showed abnormal

19  results on all timed measures requiring visuomotor and manual

20  dexterity and fluency speed.   Id.

21       Dr. Binder concluded that plaintiff may have some valid

22  cognitive deficits in the area of visual thinking, thinking speed,

23  visuomotor speed, and manual dexterity speed, as well as mental

24  flexibility or problem solving.   Id.

25       In December 2005, plaintiff began counseling sessions with

26  therapist Misty McArthur and psychologist Ken Ihli, Ph.D.   Tr. 248-

27  57.   He treated with them until August 25, 2006, a couple of weeks

28  before his disability claim hearing before the ALJ.   Id.

10 - FINDINGS & RECOMMENDATION

1    In the intake summary, McArthur and Dr. Ihli noted that
2  plaintiff presented with symptoms of depression including depressed
3  mood, fatigue, lack of energy, weight gain, feelings of guilt and
4  worthlessness, poor concentration, and disturbed sleep, including
5  insomnia.  Tr. 248.  Plaintiff reported that his depression was
6  worse during the week and better on the weekends, because he goes
7  out and does things.  Id.  The intake summary noted that his
8  depression is exacerbated by the fact that he is unemployed and
9  cannot keep a job due to his medical condition.  Id.  Plaintiff
10 also reported being depressed about his finances and not having his
11 own place to live.  Id.  Plaintiff reported that he had been
12 depressed for "years" before beginning his current regimen of anti-
13 convulsant medication that he had been taking for several years.
14 Id.

15    In the "Impressions" section of the Intake Summary, McArthur
16 and Dr. Ihli noted that plaintiff's speech was normal, but slightly
17 soft, and that his affect was consistently flat throughout the
18 interview with thought processes being somewhat overinclusive,
19 making it difficult, at times, to keep him on task.  Id.  His
20 judgment and memory appeared to be intact.  Id.

21    In the "Clinical Formulation" section of the Intake Summary,
22 McArthur and Dr. Ihli stated that plaintiff met the criteria for
23 Major Depressive Disorder, Recurrent, Moderate, Chronic.  Id.  They
24 noted that he had a history of years of depressive episodes.  Id.
25 They also stated that his medical condition had prevented him from
26 being able to maintain steady employment and an independent living
27 situation which had exacerbated his depression and promoted
28 feelings of worthlessness and constant discouragement.  Id.

11 - FINDINGS & RECOMMENDATION

1    Plaintiff's problem list was stated as depression and
2  chronic/incapacitating medical illness. Tr. 249.  He was rated as
3  having a Global Assessment of Functioning (GAF) score of 52.  Id.
4  The goals were to elevate his mood and explore how depression may
5  be related to chronic illness.  Id.

6    Plaintiff saw McArthur approximately five times between
7  January 5, 2006, and April 6, 2006, and then saw Dr. Ihli
8  approximately four times between May 4, 2006, and August 25, 2006.
9  Tr. 250-57.

10    At his first appointment with McArthur, plaintiff reported
11  that he was more depressed during the week because he has less
12  contact with his brothers and stepbrothers, his primary social
13  contacts.  Tr. 250.  He also complained about being discouraged as
14  result of his inability to keep a job.  Id.  McArthur noted
15  plaintiff's additional concern that if he found a job, his benefits
16  would be cut and he would no longer be able to afford his
17  medications.  Id.  McArthur suggested that plaintiff generate ideas
18  to increase his social activity during the week, and to use
19  exercise to boost his mood.  Id.

20    On January 19, 2006, plaintiff reported that his depression
21  was a 6, on a 1-10 scale, with 10 being the most depressed.  Tr.
22  253.  He further reported that he had exercised some over the prior
23  two weeks.  Id.

24    On February 2, 2006, plaintiff reported his depression was a
25  7, on the same 1-10 scale.  Id.  He also again stated that he would
26  like to get a job, but that he would lose his insurance to pay for
27  his seizure medications and thus, did not know what to do.  Id.

28    On February 16, 2006, plaintiff reported, as he had in the

12 - FINDINGS & RECOMMENDATION

1  prior sessions, of frustration with his living situation.  Tr. 254.
2  He did not rate his depression at that time, although he described
3  feeling more depressed as a result of arguing among his mother, his
4  aunt, and his aunt's roommate in his household.  Id.

5      In a formal treatment plan completed by McArthur on February
6  16, 2006, plaintiff's GAF was 52.  Tr. 251.  McArthur noted that
7  his measurable objectives included going out several times per day
8  to ease his isolation and depression, to exercise, and to reduce
9  his depression from an 8, on a 1-10 scale, to a 4 or 5.  Id.

10     Plaintiff missed his appointments in March 2006 because he
11  moved.  Tr. 254.  He last saw McArthur on April 6, 2006.  Id.  He
12  reported his depression at an 8, on the 1-10 scale.  Id.  He noted
13  increased irritability as a result of living in a new apartment
14  with his mother.  Id.  He did report that socializing with his
15  brother helped his depression to some extent.  Id.

16     Plaintiff saw Dr. Ihli on May 4, 2006.  Tr. 255.  Dr. Ihle's
17  handwritten chart notes are almost impossible to read.  Tr. 255-57.
18  As best as I can discern, plaintiff reported at this visit that his
19  mood was at a 5 most of the time, as low as a 4 some of the time,
20  and an 8 at its highest.  Tr. 255.  Plaintiff described continued
21  frustration with this mother, and hopelessness.  Id.

22     On June 20, 2006, plaintiff reported that he was doing "pretty
23  well."  Tr. 256.  On July 12, 2006, plaintiff again reported that
24  he was doing "all right."  Id.  Dr. Ihli also wrote a formal
25  treatment plan on that date, indicating that the goal was to
26  achieve an improved stable mood, with a reasonable amount of
27  recreational activities.  Tr. 252.  Plaintiff was to, hopefully,
28  achieve a mood of "6" or better, most of the time, and would plan

13 - FINDINGS & RECOMMENDATION

1  and do at least one activity that gets him out of the house, each
2  day.  Id.

3      On August 25, 2006, Dr. Ihli noted that plaintiff again
4  reported that he was doing "all right."  Tr. 257.

5  II.  Plaintiff's Testimony

6      Plaintiff testified that while he graduated from high school
7  with a regular diploma, he had taken special education classes.
8  Tr. 279.  He described difficulties with reading, specifically, in
9  comprehension, requiring him to reread material.  Tr. 280.  He
10 stated that he has had the reading problem throughout school, and
11 continuing to the present.  Id.  He also described problems in
12 math, including an inability to add in his head, necessitating that
13 he write things out on paper.  Id.  He further noted that his math
14 skill impairment impacts his daily life in such activities as the
15 ability to make change and the ability to maintain a checking
16 account.  Tr. 280-81.

17     Plaintiff testified that his reading and math difficulties
18 have impaired his ability to work because in past jobs, he could
19 not comprehend what was going on and people had to explain things
20 to him over and over again.  Tr. 282-83.

21     Plaintiff stated that he had done janitorial work for five or
22 six months just out of high school.  Tr. 284-85.  He worked for a
23 company that made "ribbons for computers" and printers, but it
24 lasted only two weeks because he was too slow.  Tr. 285-86.  He
25 later worked for a little over a year as a punch press operator.
26 Tr. 286.  While he was there, the company sped up the manufacturing
27 process by adding a robot, and plaintiff could no longer keep up.
28 Id.  He was laid off.  Id.  He worked at other punch press operator

14 - FINDINGS & RECOMMENDATION

positions, but had trouble keeping up with those as well.  Tr. 287.
Plaintiff also worked for Jeld-Wen, putting protective caps on
windows before shipping, but he could not lift the windows because
of his shoulder and left the job after three months.  Tr. 287-88.
Plaintiff further described a series of other jobs that he held for
short periods of time.  Tr. 289-91.

Plaintiff stated that his medications controlled his grand mal
seizures.  Tr. 291.  At the time of the hearing, he was still
taking 750 milligrams of Depakote three times per day, and 100
milligrams of Lamictal, two times per day.  Id.  He also takes
medications for acid reflux and insomnia.  Id.

Plaintiff described the side effects of his seizure
medications as shaking, slowing down his thought process, and
slurring his speech.  Tr. 292.  He further described the tremors as
head and hand shaking.  Id.

He explained that while the grand mal seizures are controlled,
he still experiences periods when he "zones out," when he stares
into space for ten to fifteen minutes, and his head moves a little
bit.  Tr. 293.  These occur two times per day.  Id.

Plaintiff attested to problems with memory.  Id.  He sometimes
forgets to take his medication, or he forgets what he went to the
store to purchase once he is there.  Tr. 294.  He has difficulty
with comprehension.  Id.  He has a hard time with simple
instructions and must read written instructions several times to
try to understand the meaning.  Id.

Plaintiff described feeling stress under pressure.  Tr. 295.
He gets irritated and angry when he cannot do something quickly.
Id.  He has a hard time performing even simple tasks quickly and

15 - FINDINGS & RECOMMENDATION

described himself as being slower than normal.  Id.  As an example,
he stated that cooking or washing dishes are routine tasks that he
cannot perform quickly.  Id.

Plaintiff stated that his left shoulder mobility is limited
following a dislocation and surgery.  Tr. 297.  He takes Tylenol
for any problems with his shoulder.  Id.

III.  Lay Witness Testimony

Plaintiff's mother, Patricia Males, testified at the hearing.
She noted that plaintiff has trouble with his memory, and gave the
example of being unable to finish making a sandwich because he has
forgotten what to put on it.  Tr. 302.  She also mentioned that he
forgets why he goes to the store.  Id.  She indicated that he has
problems at times with his medications because he forgets that he
has taken them.  Tr. 305.

She stated that plaintiff was not good at math.  Tr. 302.  He
counts on his fingers and is not good at making change or balancing
a checkbook.  Tr. 303.  He also has a hard time filling out forms
because of his failure to comprehend that it is asking.  Id.

Plaintiff's mother clarified that she believed plaintiff's
"zone outs" are actually called petit seizures, and that they last
ten or fifteen minutes.  Tr. 303-04.  During that time, plaintiff
is unresponsive.  Tr. 304.  She could not estimate how often they
occur, but said she had observed three or four herself.  Id.

IV.  Vocational Expert Testimony

Vocational Expert (VE) Gail Young testified at the hearing.
The ALJ posed a hypothetical to the VE which first included the
left upper extremity limitations assessed by Dr. Kehrli.  Tr. 309.
Additionally, he included a limitation to routine, repetitive work.

16 - FINDINGS & RECOMMENDATION

1  Id.  In response, the VE testified that plaintiff could return to
2  his prior work.  Tr. 310.

3      Alternatively, the ALJ asked the VE whether, taking the
4  exertional and non-exertional limitations already posed, and
5  considering plaintiff's age, education, and prior work experience,
6  there were other jobs existing in the state or several regions of
7  the country, that the person could perform.  Id.  The VE identified
8  general assembly work, electronics worker, packing line worker, and
9  hand packers, as such jobs the person could perform.  Tr. 310-12.

THE ALJ'S DECISION

11     The ALJ determined that plaintiff had not engaged in
12 substantial, gainful activity since March 1, 2002, plaintiff's
13 alleged onset date.  Tr. 16.  He next determined that plaintiff
14 suffered from the severe impairments of a seizure disorder and left
15 shoulder injuries.  Id.  The ALJ concluded that plaintiff's
16 depression was not a severe impairment.  Tr. 16-17.  The ALJ then
17 determined that plaintiff's impairments, either singly or in
18 combination, did not meet or equal a listed impairment.  Tr. 17.

19     Next, the ALJ determined plaintiff's residual functional
20 capacity (RFC).  Tr. 17-19.  He concluded that plaintiff has the
21 RFC to lift twenty-five pounds occasionally and frequently with the
22 left upper extremity, and no limitations in lifting or carrying
23 with the right upper extremity.  Id.  He concluded that plaintiff
24 could stand and walk six hours out of an eight-hour day, and sit
25 about six hours out of an eight-hour day.  Id.  He determined that
26 plaintiff could occasionally climb ramps and stairs, but could not
27 climb ladders, ropes, or scaffolds.  Id.  He limited plaintiff to
28 occasional overhead reaching with the left upper extremity.  Id.

17 - FINDINGS & RECOMMENDATION

1 He further limited him to routine, repetitive work. Id. He also

2 found that he should avoid concentrated exposure to hazards. Id.

3      As part of this determination, the ALJ, as discussed more

4 fully below, found that plaintiff's subjective testimony was only

5 partially credible and that plaintiff's mother's testimony was also

6 only partially credible. Id. Based on the RFC, the ALJ concluded

7 that plaintiff was able to perform his past relevant work. Tr.19.

8 Alternatively, the ALJ concluded that considering plaintiff's age,

9 education, work experience, and RFC, he could perform the jobs of

10 production assembler, electronics worker, packing line worker, and

11 hand packer, all existing in significant numbers in the national

12 economy. Tr. 19-20. Thus, the ALJ concluded that plaintiff was

13 not disabled.

14               STANDARD OF REVIEW & SEQUENTIAL EVALUATION

15      A claimant is disabled if unable to "engage in any substantial

16 gainful activity by reason of any medically determinable physical

17 or mental impairment which . . . has lasted or can be expected to

18 last for a continuous period of not less than 12 months[.]" 42

19 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according

20 to a five-step procedure. Baxter v. Sullivan, 923 F.2d 1391, 1395

21 (9th Cir. 1991). The claimant bears the burden of proving

22 disability. Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.

23 1989). First, the Commissioner determines whether a claimant is

24 engaged in "substantial gainful activity." If so, the claimant is

25 not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20

26 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner

27 determines whether the claimant has a "medically severe impairment

28 or combination of impairments." Yuckert, 482 U.S. at 140-41; see

18 - FINDINGS & RECOMMENDATION

1 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not

2 disabled.

3     In step three, the Commissioner determines whether the

4 impairment meets or equals "one of a number of listed impairments

5 that the [Commissioner] acknowledges are so severe as to preclude

6 substantial gainful activity."  Yuckert, 482 U.S. at 141; see 20

7 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is

8 conclusively presumed disabled; if not, the Commissioner proceeds

9 to step four.  Yuckert, 482 U.S. at 141.

10     In step four the Commissioner determines whether the claimant

11 can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e),

12 416.920(e).  If the claimant can, he is not disabled.  If he cannot

13 perform past relevant work, the burden shifts to the Commissioner.

14 In step five, the Commissioner must establish that the claimant can

15 perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§

16 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its

17 burden and proves that the claimant is able to perform other work

18 which exists in the national economy, he is not disabled.  20

19 C.F.R. §§ 404.1566, 416.966.

20     The court may set aside the Commissioner's denial of benefits

21 only when the Commissioner's findings are based on legal error or

22 are not supported by substantial evidence in the record as a whole.

23 Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a

24 mere scintilla," but "less than a preponderance."  Id.  It means

25 such relevant evidence as a reasonable mind might accept as

26 adequate to support a conclusion.  Id.

27                                     DISCUSSION

28     Plaintiff contends that the ALJ erred by (1) determining that

19 - FINDINGS & RECOMMENDATION

1  plaintiff's depression was not a severe impairment; (2) determining
2  that the side effects of plaintiff's anti-convulsant medications
3  did not impact his functional ability to perform substantial
4  gainful activity; (3) failing to assess all of plaintiff's
5  impairments in combination; and (4) determining that plaintiff
6  could perform his past relevant work.  I address the arguments in
7  turn.

8  I.  Depression

9       The ALJ rejected depression as a severe impairment.  Tr. 16-
10 17.  The ALJ acknowledged that plaintiff reported depression with
11 low mood, fatigue, lack of energy, weight gain, feelings of guilt
12 and worthlessness, poor concentration, and disturbed sleep, to
13 therapist McArthur in December 2005.  Tr. 16.  The ALJ noted that
14 McArthur diagnosed plaintiff with major depressive disorder in a
15 report cosigned by Dr. Ihli.  Id.

16      The ALJ explained that the counseling treatment records showed
17 monthly counseling sessions through August 2006, revolving
18 primarily around family stressors.  Tr. 17.  The ALJ remarked that
19 plaintiff had not been prescribed anti-depressant medication, and
20 had not alleged depressive symptoms or other mental impairment at
21 the time of his disability benefits application.  Id.  The ALJ
22 explained that there was no evidence of any work-related functional
23 limitations related to depression.  Id.  He concluded that it was
24 not a severe impairment.  Id.

25      A severe impairment is one that limits a plaintiff's ability
26 to perform basic work activities.  20 C.F.R. §§ 404.1520(c),
27 416.920(c).  "An impairment . . . may be found not severe only if
28 the evidence establishes a slight abnormality that has no more than

20 - FINDINGS & RECOMMENDATION

1  a minimal effect on an individual's ability to work." Webb v.
2  Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotation
3  marks omitted).  "Step two, then, is a de minimis screening device
4  used to dispose of groundless claims[.]" Id. (internal quotation
5  and brackets omitted).

6      Plaintiff argues that the ALJ failed to recognize that
7  plaintiff's isolation is the reason why the counseling notes
8  primarily refer to plaintiff's problem as difficulties with his
9  family.  He notes that because he spends most of his time with his
10 family, his counseling treatment addressed issues with them.  This
11 is not, plaintiff contends, because of a lack of depressive
12 symptoms in other contexts, but simply a result of his particular
13 circumstances.

14     Plaintiff also contends that it was error for the ALJ to rely
15 on the fact that he does not take anti-depressant medication as an
16 indication that his depression is not a severe impairment when the
17 record clearly reflects that plaintiff rejected the medication out
18 of fear of it adversely reacting with his anti-seizure medication.
19 E.g., Tr. 248, 250, 253.

20     Finally, plaintiff faults the ALJ for not recognizing Dr.
21 Ihli's GAF score of 52.  A GAF of 52 falls in the range for
22 moderate symptoms, suggested by flat affect and circumstantial
23 speech or occasional panic attacks, or moderate difficulty in
24 social, occupational, or school functioning, suggested by no
25 friends or an inability to keep a job.  American Psychiatric Ass'n,
26 Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed.,
27 Revised 2000).

28     In response, defendant notes that plaintiff told Dr. Syna that

1  he had mild depression, which defendant contends is a non-severe

2  impairment. See 20 C.F.R. § 404.1520a(d)(1) (noting that when SSD

3  undertakes to evaluate a mental impairment, the evaluation includes

4  rating the degree of the claimant's functional assessment in four

5  areas and if the degree of limitation is mild, defendant will

6  generally conclude that the impairment is not severe); 20 C.F.R. §

7  416.920a(d)(1)(same).

8      Defendant acknowledges that Dr. Ihli's diagnosis was of

9  moderate depression based on the GAF of 52. Defendant concedes

10 that a moderate mental impairment is a severe impairment. As

11 recently explained by the Eastern District of Texas:

12        There is more than a semantic difference between the
          terms "mild" and "moderate." Mental impairments are
13        evaluated according to a five-point scale: "none, mild,
          moderate, marked, and extreme." See 20 C.F.R. §
14        404.1520a(c)(4) (2005). The first two points on the
          scale, i.e. "none" and "mild" do not indicate a severe
15        impairment. Id. The last point on the scale, i.e.,
          "extreme" represents a degree of limitation presumptively
16        incompatible with ability to do any gainful activity. Id.
          The middle point, "moderate", while not presumptively
17        disabling, nevertheless represents a severe impairment.
          Id.
18
   Allsbury v. Barnhart, 460 F. Supp. 2d 717, 727 (E.D. Tex. 2006).
19
       Defendant contends, however, that while a moderate limitation
20
   is a severe impairment, the ALJ weighed the evidence, noted the
21
   lack of prescribed anti-depressant medication or stated functional
22
   limitations due to depression, and found it non-severe.
23
       The ALJ erred in finding plaintiff's depression to be non-
24
   severe. First, much like the inappropriateness of drawing a
25
   negative inference from claimant's failure to seek medical
26
   treatment because of an inability to pay, it was inappropriate for
27
   the ALJ to diminish plaintiff's depression because of his failure
28

22 - FINDINGS & RECOMMENDATION

1  to take anti-depressants when plaintiff's reluctance to do so is
2  based on his fear that the anti-depressants will interfere with the
3  anti-seizure medications.  See Orn v. Astrue, 495 F.3d 625, 638
4  (9th Cir. 2007) (an "'adjudicator must not draw any inferences
5  about an individual's symptoms and their functional effects from a
6  failure to seek or pursue regular medical treatment without first
7  considering any explanations that the individual may provide, or
8  other information in the case record, that may explain infrequent
9  or  irregular  medical  visits  or  failure  to  seek  medical
10 treatment[.]'") (quoting Social Security Regulation (SSR) 96-7p at
11 7-8).

12     Second, while plaintiff may have told Dr. Syna that his
13 depression was mild, it is notable that Dr. Syna's actual diagnosis
14 was "depression," without reference to the degree of depression
15 plaintiff was experiencing.  Tr. 260.  Additionally, the report of
16 Dr. Syna is entitled to less weight than the diagnosis and
17 treatment records of Dr. Ihli, because Dr. Ihli, who specializes in
18 mental health issues, was a treating practitioner who saw plaintiff
19 several times, while Dr. Syna, who specializes in neurology, saw
20 plaintiff only once for an evaluation of his seizures.

21     Third, defendant's own memorandum notes plaintiff's contention
22 that he has difficulty interacting with others.  Deft's Mem. at p.
23 7.  The counseling treatment records refer to his irritability and
24 frustration with others, as well as his isolation.  E.g., Tr. 250
25 (discussed ways to increase his social activity); 251 (objective is
26 to go out several times a day to ease isolation and depression);
27 252 (goal is to obtain a reasonable level of recreational
28 activities with an objective of plaintiff planning and doing at

23 - FINDINGS & RECOMMENDATION

1 least one activity that gets him out of the house each day); 254
2 (frustration with members of family and extended family living in
3 apartment, causing insomnia and increasing depression); 254
4 (increased irritability as a result of conflict with mother).
5 Accordingly, while the record lacks express reference to an actual
6 history of workplace functional limitations caused by the
7 depression, there is evidence of at least minimal difficulty
8 interacting with people, especially those in close quarters, which
9 might be found in a work setting.  Thus, the ALJ erred in finding
10 plaintiff's depression to be non-severe.

11     Alternatively, defendant argues that even if the ALJ erred in
12 finding plaintiff's depression non-severe, any such error was
13 harmless because the ALJ accounted for the impairment by limiting
14 him to routine, repetitive work.  I disagree.

15     A step two error may be harmless if the ALJ accounts for the
16 impairment later in the sequential evaluation process.  Lewis v.
17 Astrue, 498 F.3d 909, 911 (9th Cir 2007) (step two error harmless
18 because ALJ considered limitations at step four).  Defendant
19 contends that by limiting plaintiff to routine, repetitive work in
20 unskilled jobs, the ALJ addressed plaintiff's social limitation.

21     As support, defendant initially cites to 20 C.F.R. §§
22 404.1568(a), 416.968(a).  However, neither of these regulations
23 stand for such a proposition.  These regulations define unskilled
24 work as

25          work which needs little or no judgment to do simple
             duties that can be learned on the job in a short period
26          of time.  The job may or may not require considerable
             strength.  For example, we consider jobs unskilled if the
27          primary work duties are handling, feeding and offbearing
             (that is, placing or removing materials from machines
28          which are automatic or operated by others), or machine

24 - FINDINGS & RECOMMENDATION

> tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.

20 C.F.R. §§ 404.1568(a), 416.968(a).  The regulations make no mention of limited interaction with coworkers, supervisors, or the public.

Defendant next cites to SSR 85-15 which generally addresses evaluation of solely nonexertional impairments.  SSR 85-15 (available at 1985 WL 56857).  In a section entitled "Mental Impairments," the regulation notes that

> [t]he basic demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

1985 WL 56857, at *4.  While the regulation goes on to note that unskilled "jobs ordinarily involve dealing primarily with objects, rather than with data or people," id., this does not negate the previously stated basic demand of unskilled work that the claimant be able to appropriately respond to supervision and coworkers. Moreover, the regulation addresses claimants whose sole limitation is nonexertional, which is not the case here.

Because the ALJ's limitation to routine, repetitive, unskilled jobs does not categorically address a social limitation of difficulty interacting with others, the ALJ's step two error is not harmless.

II.  Medication Side Effects

Plaintiff argues that the ALJ failed to consider the effects of his anti-seizure medication on his overall ability to function. Plaintiff notes that he consistently reported tremors in both his

25 - FINDINGS & RECOMMENDATION

hands and head to the point that it impacted his work performance. He further notes his reports of slow thinking and response, affecting his motor function.  He argues that the ALJ erred by failing to consider his and his mother's consistent testimony regarding the effects of his medication and his inabilities to perform simple math, balance a checkbook, and complete forms.

The ALJ concluded that while plaintiff's impairments could cause some of his alleged symptoms, plaintiff's testimony regarding the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  Tr. 17.

In the Ninth Circuit, once a claimant produces objective medical evidence of an impairment or impairments and shows that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  When determining the credibility of a plaintiff's limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).

Here, the ALJ noted plaintiff's inconsistent statements, his questionable motivation to work, and his ability to work after his alleged disability onset date, as the bases for rejecting the excess symptom testimony.  Tr. 17-19.  First, the ALJ noted that plaintiff's statements of his frequent petit mal or "zoning out" seizures was not supported by the treatment record given that in

26 - FINDINGS & RECOMMENDATION

1 December 2004, he reported that these episodes had not occurred in
2 a couple of years.  Tr. 18, 259.

3     The ALJ further noted that a February 2003 neurological exam
4 by Dr. Koller revealed that plaintiff's speech was fluent and that
5 he was able to follow complex commands without difficulty, although
6 he seemed slow to respond.  Tr. 18, 218.  The ALJ noted that Dr.
7 Koller wrote that plaintiff's neurologic exam was unremarkable.
8 Tr. 18, 219.  The ALJ remarked that plaintiff himself reported to
9 Dr. Koller that while he was a little bit slow in his thinking and
10 speech, he was doing reasonably well and that he was on
11 unemployment and looking for work.  Tr. 18, 217.  The ALJ also
12 noted that plaintiff has a driver's license.  Id.

13     Second, the ALJ noted that the record revealed that plaintiff
14 led an active lifestyle including looking for work, driving, doing
15 errands for his mother, and driving family members to work.  Tr.
16 18, 217, 253.  He remarked that plaintiff reported that he would
17 like to work, but feared losing his ability to obtain his
18 medications through, presumably, the Oregon Health Plan, should he
19 obtain a job.  Tr. 18, 250, 253.

20     Third, the ALJ noted that the record showed that in 2003,
21 plaintiff worked in a market, but left employment there not because
22 he was unable to perform the job, but because of fear generated by
23 the stabbing of a prior employee.  Tr. 18, 222.  Notably, plaintiff
24 held this job after his alleged March 1, 2002 onset date.

25     As noted above, daily activities and inconsistent statements
26 are proper bases for discrediting a plaintiff's subjective
27 testimony.  Orteza, 50 F.3d at 750; see also Light v. Social Sec.
28 Admin, 119 F.3d 789, 792 (9th Cir. 1997) (in weighing a claimant's

27 - FINDINGS & RECOMMENDATION

credibility, the ALJ may consider inconsistencies in claimant's testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians).

A claimant's lack of motivation to work may also be a relevant credibility factor. See Osenbrock v. Apfel, 240 F.3d 1157, 1165-66 (9th Cir. 2001) (affirming ALJ's determination that plaintiff's testimony lacked credibility when, inter alia, plaintiff was unmotivated to change his lifestyle). Undoubtedly, plaintiff's predicament of being forced to choose between required prescription medications on the one hand and a job on the other, imposes a Hobson's choice on plaintiff. Nonetheless, I cannot conclude that the ALJ erred by relying on plaintiff's testimony showing a motive to avoid work because of a fear of the loss of his medical benefit and not because of any functional limitations caused by an impairment.

Additionally, the ALJ did not err by relying on plaintiff's post-onset date work activity and the fact that it ended for reasons unrelated to an impairment. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (affirming ALJ's rejection of plaintiff's subjective testimony when evidence showed, inter alia, that plaintiff continued to work after last insured date); Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (affirming ALJ's rejection of plaintiff's subjective testimony when evidence showed, inter alia, that plaintiff left work because he was laid off, not because of his impairments).

Based on the record as a whole, substantial evidence in the record supports the ALJ's credibility determination regarding plaintiff's subjective limitations and symptom testimony. The ALJ

1 did not err in this regard.

2     As to plaintiff's mother's testimony, lay witnesses are not
3 competent to testify to medical diagnoses, but they are competent
4 to testify as to a plaintiff's symptoms or how an impairment
5 affects his or her ability to work. Stout v. Commissioner, 454
6 F.3d 1050, 1053 (9th Cir. 2006). The ALJ may disregard a lay
7 witness's testimony by offering reasons germane to the witness.
8 Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). If the ALJ
9 notes "arguably germane reasons" for dismissing the lay witness
10 testimony, he is not required to "clearly link his determination to
11 those reasons." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).

12     Here, the ALJ concluded that plaintiff's mother's testimony
13 was not entirely credible in light of plaintiff's treatment record.
14 Tr. 18. As with plaintiff's testimony, the ALJ noted that the
15 record showed that in December 2004, plaintiff stated he had not
16 experienced a petit mal or "zoning out" seizure for a couple of
17 years, contradicting the subjective testimony on this point. Also,
18 the ALJ noted that while plaintiff may have some memory problems,
19 as testified to by plaintiff's mother in her examples of plaintiff
20 forgetting why he went to the store or how to make a sandwich,
21 there was no difficulty in performing routine, repetitive tasks.
22 Tr. 18. The ALJ gave "arguably germane reasons" for dismissing
23 these aspects of plaintiff's mother's testimony.

24 III. Combination of Impairments

25     Plaintiff contends that the ALJ erred by failing to consider
26 plaintiff's grand mal seizure disorder in combination with (1)
27 medication side effects causing decreased motor and mental
28 function; (2) impaired intellectual functioning with learning

1  disabilities; (3)   slow comprehension and completion of tasks,
2  along with memory problems; (4) shoulder problems; and (5) chronic
3  depression.

4        Plaintiff's argument is a bit unclear in that although he
5  refers to a combination of impairments, he appears to direct his
6  argument more to the ALJ's RFC finding rather than to an error made
7  at step two (requiring determination of whether a combination of
8  impairments is severe), or step three (requiring determination of
9  whether a combination of impairments meets or equals a listed
10 impairment).   I do not view this as a step two argument because
11 plaintiff does not argue that each one of these alleged functional
12 limitations is an independent impairment.   While he contends, for
13 example, that he experiences decreased motor and mental functioning
14 from the medication side effects, he does not contend that this is
15 a separate impairment.  See 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D)
16 (a "'physical or mental impairment'" is an impairment that results
17 from anatomical, physiological, or psychological abnormalities
18 which are demonstrable by medically acceptable clinical and
19 laboratory diagnostic techniques.").   Because step two addresses
20 the severity of an impairment or a combination of impairments, and
21 plaintiff does not appear to contend that these limitations meet
22 the definition of an impairment, this is not a step two argument.

23      It also does not appear to be a step three argument because
24 plaintiff fails to identify the listed impairment his combination
25 of functional limitations equals or meets.  As it is plaintiff's
26 burden to establish disability and he bears the burden of proof
27 through step four, he has not established that a combination of
28 impairments equals or meets a listed impairment.

30 - FINDINGS & RECOMMENDATION

1    Accordingly, I view plaintiff's argument here as addressed to
2  the ALJ's failure to include all of the alleged functional
3  limitations in the RFC.[5]  Considering the argument in this vein, I
4  agree with plaintiff in part.

5    First, the ALJ failed to consider any functional limitations
6  as a result of plaintiff's depression.  The record suggests that
7  the depression affects plaintiff's interactions with people.  The
8  ALJ erred by not making clear the degree of work-related functional
9  limitation caused by the depression and, if appropriate,
10 incorporating any such limitation into the RFC.

11   Second, while the ALJ did not err in rejecting certain parts
12 of plaintiff's and his mother's testimony regarding plaintiff's
13 slowness in thinking and memory problems, or the testimony that he
14 frequently experienced petit mal or "zoning out" seizures, the ALJ
15 failed to account for the treating and examining physicians' notes
16 of hand and head tremors.  E.g., Tr. 215 (Dr. Reid observed mild
17 hand tremor in April 1999); 213 (Dr. Gancher observed lateral head
18 tremor in May 1999); 210 (Dr. Gancher observed slight head tremor
19 and barely discernable hand tremor in March 2001); 209 (Dr. Reid
20 observed slight bilateral hand tremor in March 2001); 221 (Dr. El-
21 Attar observed bilateral hand tremor in May 2004); 260 (Dr. Syna
22 observed mild head and hand tremors in December 2004).

23   While these are uncontradicted medical findings that the ALJ
24 was obligated to accept, the record lacks information as to what,

25

26   [5]  I assume this was defendant's understanding of
27 plaintiff's argument as well, given that defendant's response
   memorandum did not address this as a step two or step three
28 argument.  Notably, plaintiff did not file a reply memorandum.

31 - FINDINGS & RECOMMENDATION

1  if any, work-related functional limitations these symptoms produce.

2  The ALJ was under a duty to develop the record in this regard.

3       Additionally, at least one treating physician, Dr. Gancher,

4  reported that plaintiff had slowed mentation and difficulty

5  concentrating.    Tr. 210.    The ALJ failed to discuss this or

6  indicate how his RFC addressed this limitation.

7       Third, I reject plaintiff's argument to the extent that he

8  contends the ALJ failed to account for his shoulder problems in the

9  RFC.   To the contrary, the ALJ relied on the RFC assessment

10  completed in July 2004 by Dr. Kehrli. Tr. 17, 309.   He limited

11  plaintiff to "lift[ing] 25 pounds occasionally and frequently with

12  the left upper extremity."[6]   Tr. 17.   He further limited him to

13  occasional overhead reaching with the left upper extremity.   Id.

14       In support of these shoulder limitations, the ALJ generally

15  credited plaintiff's subjective testimony.    Tr. 18.    The ALJ

16  explained that while plaintiff had some limitations in overhead

17  activities and lifting with the left arm, there was no evidence of

18  other restrictions. Id. He noted that plaintiff took only Tylenol

19  for pain, and had received no other treatment in recent years.

20  While a May 2004 consultative examination showed some tenderness to

21  palpation in the anterior region of the shoulder joint, there was

22  no swelling or atrophy, range of motion was only slightly

23  decreased, and he had full strength in all extremities.    Id.

24  Substantial evidence in the record supports the ALJ's RFC

25  determinations as to plaintiff's shoulder.

26

27

28      [6]  As noted above in Footnote #4, the references to both
     frequently and occasionally are a bit unclear.

32 - FINDINGS & RECOMMENDATION

IV.  Prior Work

Finally, plaintiff contends that the ALJ erred by determining that he could return to his prior work as a punch press operator and as a janitor.  Plaintiff argues that the record shows he cannot maintain average pace on the job due to the combination of exertional and nonexertional factors.  He notes that the VE testified that a person who cannot maintain average pace in performing basic tasks could not perform the employment the VE identified in response to the ALJ's hypotheticals.  Based on that testimony, plaintiff asks that the ALJ's decision be reversed and remanded for a determination of benefits.

I agree with plaintiff that the ALJ's decision is not fully supported by substantial evidence in the record and thus, remand is required.  I do not accept plaintiff's argument that the record demonstrates his inability to maintain average pace in the jobs identified by the ALJ requiring a remand for benefits.

As noted above, the ALJ erred in failing to consider whether certain impairments (depression) or symptoms (tremors, slowed mentation, difficulty concentrating), as identified by the treating and examining physicians or psychologist, cause work-related functional limitations.  While the ALJ had a sufficient basis for rejecting plaintiff's and his mother's credibility testimony, other evidence in the record creates questions about plaintiff's condition that the ALJ left unaddressed, requiring a remand for further proceedings.

As a result of plaintiff's subjective testimony being discredited, the record lacks support for the hypothetical posed to the VE by plaintiff's counsel regarding an inability to maintain

33 - FINDINGS & RECOMMENDATION

average pace.  Accordingly, it would be inappropriate to rely on
that VE opinion to make an award of benefits.  However, remand for
further proceedings is appropriate because the ALJ's failure to
address possible work-related functional limitations renders his
RFC invalid and thus, his conclusions at step four and step five
are not supported by substantial evidence in the record.  See
Osenbrock, 240 F.3d at 1163-64 (hypothetical posed to the VE must
be accurate, detailed, supported by the medical record, and reflect
each of the plaintiff's limitations).

CONCLUSION

I recommend that the Commissioner's decision be reversed and
remanded for further proceedings.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a
United States District Judge for review.  Objections, if any, are
due January 10, 2008.  If no objections are filed, review of the
Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due
January 24, 2008, and the review of the Findings and Recommendation
will go under advisement on that date.

IT IS SO ORDERED.

Dated this __26th__ day of __December__, 2007.


_/s/ Dennis James Hubel_
Dennis James Hubel
United States Magistrate Judge

34 - FINDINGS & RECOMMENDATION